UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TERRY L. UZZLE,                          )
                                         )
            Plaintiff,                   )
                                         )
      vs.                                )          No. 4:09-CV-1190 (CEJ)
                                         )
MICHAEL J. ASTRUE, Commissioner          )
of Social Security,                      )
                                         )
            Defendant.                   )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On October 23, 2006, plaintiff Terry L. Uzzle filed applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of December 22, 2005. (Tr. 110-20). After plaintiff's application was denied on initial consideration (Tr. 74-77), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 68).

The hearing was held on September 17, 2008. Plaintiff was represented by counsel. (Tr. 20-55). The ALJ issued a decision on November 26, 2008, denying plaintiff's claims. (Tr. 5-18). The Appeals Council denied plaintiff's request for review on June 26, 2009. (Tr. 1-3). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

The ALJ received testimony from the plaintiff, who was 48 years old at the time of the hearing. He reported that he had completed two years of technical school and some college courses. (Tr. 24). He was in the military for nineteen years and has a service-connected disability of sleep apnea. (Tr. 34). He resides with his wife; his two children are in military service. (Tr. 25).

At the time of the hearing, plaintiff worked as a union business agent. He described his duties as filing paperwork for two or three hours each week, for which he received approximately $800 or $900 a month in payment; he also met with approximately 150 members of the local union annually. (Tr. 35, 25-26). Plaintiff had worked for a single company for several years, doing sheet metal work for fourteen years and then as a service representative. He was fired from that position because he was not cordial to the customers and failed to show up some days. (Tr. 35). Plaintiff testified that he last worked as an armed security officer. (Tr. 25-26). He was accustomed to working 70 to 80 hours a week and found it difficult to be reduced to two or three hours. (Tr. 41).

Plaintiff testified that he is unable to work as a result of his confusion and inability to concentrate. (Tr. 27). His doctor had told him that these could be symptoms of his depression or bipolar disorder or side effects of his medication. Id. He has been diagnosed with diabetes, which is controlled through diet and

-2-

Metformin,[1] and obstructive sleep apnea, for which he uses a continuous positive airway pressure (CPAP) machine.  Id.  He was also being treated for irritable bowel syndrome.  (Tr. 37).  This condition was a significant problem when he worked as a security guard because he was not always free to leave to use the restroom. Although medication has helped, it has not fully alleviated his symptoms.  (Tr. 38). Plaintiff also has a history of asthma.  (Tr. 28).  He smokes one-and-a-half packs of cigarettes each day.  Id.  His weight, which he described as "up and down," was 198 pounds at the time of the hearing; this was down ten pounds from his last medical appointment.  Id.

Plaintiff had surgery to repair a torn rotator cuff in his right shoulder in 1998. He had re-injured the shoulder and was awaiting authorization from the Veterans Administration for another surgical procedure.  (Tr. 29).  He testified that he is unable to lift a milk jug and has a limited range of motion.  (Tr. 30).  He also suffers from joint pain in his hands, wrists and shoulders.  (Tr. 31).

Plaintiff testified that his daily activities include yard work, house work and preparing meals.  (Tr. 31-32).  He does union work on the computer every day. (Tr. 33-34). He stated that his wife does not let him deal with money too much. He is able to drive.  (Tr. 32).  He walks two miles in the neighborhood every day and logs a total of about nine miles on his pedometer.  (Tr. 28).  Plaintiff was not attending to his personal hygiene.  His wife forces him to shower about once each

---

[1]Metformin is an oral medication for the treatment of Type 2 diabetes. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html (last visited on May 17, 2010).

week; it does not occur to him to do so on his own. (Tr. 32, 38). He had not brushed his teeth for days. (Tr. 38).

Plaintiff identified his mental issues as the most significant. (Tr. 33). His medications improved his depression and reduced his mood swings. He saw his psychiatrist every three months, but did not receive any counseling. (Tr. 33). He testified that he used to have a tendency to get irritable. Medication reduced this symptom, but he still experienced what he described as a "dull" mood. (Tr. 36). His energy level was very low. (Tr. 42). He had quit being a Boy Scout leader because he could not "handle the boys and stuff." (Tr. 39). He no longer has many friends or engages in regular social activities. (Tr. 40). It had been more than two years since he last saw a friend; he had not gone to a movie in a long time. (Tr. 41).

Gary Weimholt, a Vocational Expert (VE), provided testimony in response to several hypothetical scenarios: In the first, he was asked about the employment opportunities for a person of plaintiff's age, educational level, and past work experience, who is limited to performing light exertional work, in a temperature-controlled environment, with occasional pushing, pulling, and reaching. The VE was also asked to assume that the individual should avoid concentrated exposure to pulmonary irritants, unprotected heights, and hazardous machinery. The individual is limited to performing simple tasks which require no more than occasional contact with the general public and coworkers. (Tr. 48-49). Mr. Weimholt opined that such an individual could not return to his past relevant work

-4-

but could perform other jobs, such as cashiering, inspection, hand packaging, and acting as an information clerk. (Tr. 49-50).

The VE was next asked to assume that the hypothetical individual was restricted to sedentary work. The VE testified that such an individual would be able to perform work that was available in the national economy, including assembly jobs and many of those described above at the "light" exertional level. (Tr. 51). Finally, the VE was asked to assume the same individual had occasional unscheduled disruptions of the workday and workweek. He responded that there would not be work in the national economy for such an individual. Id.

Plaintiff's counsel asked the VE to assume that the individual had moderate limitations in the following abilities:[2] to understand, remember, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual, work in coordination or proximity to others without distraction, complete a workday and workweek without disruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept criticism and respond appropriately to criticism from supervisors, get along with coworkers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and set realistic

---

[2]These limitations are taken from the Psychiatric Review Technique form completed by Dr. Joan Singer on December 27, 2006. (Tr. 281-94).

goals or make plans independently of others. In response, the VE stated that there would be no jobs available for such an individual. (Tr. 52). Similarly, no work would be available for an individual with plaintiff's age, education, and work background, with a Global Assessment of Functioning (GAF)[3] of 45 to 50.[4] However, jobs would be available for the same individual with a current GAF of 65.[5] (Tr. 53).

The record includes a Disability Report dated October 23, 2006. (Tr. 133-63). Plaintiff was described as pleasant, but smelling of smoke and appearing dirty. He slumped in his chair and had a sad affect. No physical limitations were noted. The field officer noted that plaintiff's spelling was quite poor. (Tr. 135). In the portion completed by plaintiff, he listed his disabling conditions as sleep apnea, chronic major depression, joint pain, diabetes, stage I cirrhosis and fatty liver, irritable bowel syndrome, cataracts, asthma, and Persian Gulf Syndrome.

---

[3]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[4]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[5]A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

(Tr. 156).  His conditions affected his ability to concentrate or remember his duties.  He described himself as very depressed, very confused, very tired, very moody and defensive.  He did not like to be around people or large crowds.  His joint pain made it difficult for him to move.  He stopped working in December 2005 because he could not concentrate and did not have the confidence required to make "split second life and death decisions protecting [him]self or others."  Id.  His job requirements prevented him from using the restroom when needed.  He had difficulty with simple math, spelling, and writing reports.  He struggled to stay awake and had dizziness.  Id.

Plaintiff completed a Function Report.  (Tr. 164-70).  He described his daily activities as watching television, doing laundry, surfing the Internet, attempting yard work, and making supper.  (Tr. 164).  Plaintiff's wife has to remind him to bathe or change his clothes; she also helps him keep track of his medications.  (Tr. 166).  He cooks meals, but sometimes forgets what he is doing and burns the food or leaves the stove on.  Id.  His household activities include laundry, cleaning, home repair (with help), and mowing.  His wife reminds him to do these tasks and his son helps him to complete them. Plaintiff is able to drive and goes shopping once a week.  (Tr. 167).  He gets too confused to pay bills or use a checking account, although he can make change.  Id.  He used to enjoy hunting, fishing, camping, and working on cars.   (Tr. 168).  He does not spend time with other people because he gets moody. (Tr. 168-69).  Plaintiff stated that he had stopped his involvement with the Boy Scouts and his son's school because he disliked being

around others.  Plaintiff identified the following abilities affected by his condition: stair climbing, lifting, squatting, bending, kneeling, understanding, following instructions, talking, completing tasks, concentrating, getting along with others, using hands, and memory.  (Tr. 169).  He added that his joints hurt with use and that he gets confused and cannot remember things.  He can walk about a half mile before he needs to rest and can resume walking after a five-minute break.  He can pay attention for about ten or fifteen minutes.  He indicated difficulty with following instructions, whether written or spoken.  Id.  He does not get along with bosses or bill collectors.  (Tr. 170).  His inability to get along with people had cost him every job from 1998 onward.  He can handle only small amounts of stress and does not like change in routine because he gets too confused.  (Tr. 170).

### III.  Medical Records

An outpatient medication review was completed at the John Cochran Veterans Administration Medical Center on March 22, 2006.  At that time, plaintiff was prescribed Albuterol,[6] Citalopram,[7] Nortriptyline,[8] Omeprazole,[9] and

---

[6]Albuterol is an aerosol inhalant prescribed for treatment of bronchospasm. See Phys. Desk Ref. 3067 (60th ed. 2006).

[7]Citalopram is used to treat depression.  It is in the class of selective serotonin reuptake inhibitors.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last visited on May 25, 2010).

[8]Nortriptyline is a tricyclic antidepressant.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682620.html (last visited on May 25, 2010).

[9]Omeprazole is used alone or with other medications to treat ulcers, gastroesophageal reflux disease (GERD), and erosive esophagitis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html (last visited on

Naproxen.[10]  (Tr. 271).  A nursing care note dated April 6, 2006, indicates that plaintiff complained of generalized joint pain, which he described as constant, dull, and aching and which he rated at a level 3.  Treatment with nonsteroidal anti-inflammatory medications was effective.  (Tr. 269).  Among the barriers noted were deficits in long- and short-term memory, stiffness in his hands, knees, and feet, depression and possible post-traumatic stress disorder, reading comprehension, concentration, and a deficit in social support.  (Tr. 266).

On April 26, 2006, a gastroenterology consultation was conducted to address plaintiff's elevated liver enzymes.  Plaintiff reported that in the last five years he had gained 60 to 80 pounds and had been diagnosed with high cholesterol, elevated triglycerides, hypertension, and diabetes.  He had been experiencing diarrhea for at least fifteen years, with five or six bowel movements each day.  He often had to rise at night to use the bathroom.  In addition, he had sleep apnea and depression.  (Tr. 263-64).

A colonoscopy was conducted on May 26, 2006.  (Tr. 259-60).  Multiple small polyps were observed.  At follow-up on June 28, 2006, plaintiff began a trial of fiber to address the diarrhea.  (Tr. 258).  A liver biopsy was completed on July 14, 2006.  (Tr. 246-58).  The biopsy showed "mild portal inflammation."  (Tr.

_____

May 25, 2010).

[10]Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management.  See Phys. Desk Ref. 2769-70 (60th ed. 2006).

237).  During an office visit on August 4, 2006, plaintiff rated his joint pain at level 5.  (Tr. 242).   Plaintiff had cataract surgery on August 30, 2006.  (Tr. 216-29).

Plaintiff received psychiatric treatment from James Cannon, MD.  During a medication review on September 18, 2006, plaintiff reported that he continued to have more depressed days than not, with low energy and motivation.   His irritability persisted.  (Tr. 211).  Dr. Cannon described plaintiff's mental status as depressed and taciturn; no hallucinations were reported and plaintiff was appropriately oriented.  (Tr. 212).  Plaintiff had a sleep study consultation on October 3, 2006.  It was noted that his last study had been eight years earlier and that his CPAP machine was beginning to fail.  The 2006 sleep study indicated that he required increased oxygen settings.  (Tr. 207-08).  A new CPAP machine was provided on October 13, 2006.  (Tr. 203).

Plaintiff met Dr. Cannon for a medication review on November 27, 2006.  (Tr. 201-02).  Plaintiff and his wife reported that he was irritable, and had low motivation, low mood and no energy.  He had one or two fair to good days per week.  Dr. Cannon increased the dosage of plaintiff's Nortriptyline.  They discussed electroconvulsive therapy and psychotherapy.

At a nursing check on January 8, 2007, plaintiff was described as obese, unkempt, and having body odor.  (Tr. 450).  He had failed to have a fasting blood test as instructed.  (Tr. 451).  He rated his pain at level 6.  (Tr. 447).  On January 19, 2007, plaintiff informed the respiratory therapist that his CPAP machine was working well and he "wouldn't go a night without it."  (Tr. 445).  On February 26,

2007, it was noted that plaintiff read with difficulty and that instructional materials needed to be at a low level of difficulty. (Tr. 442). Dr. Cannon increased the dosage of plaintiff's prescription for Citalopram. On March 1, 2007, a screening for post-traumatic stress disorder was positive. (Tr. 438). On March 27, 2007, plaintiff attended a class designed to address obesity. (433-34). On April 23, 2007, plaintiff reported to Dr. Cannon that he was sleeping 11 to 15 hours a day and that going out for a social event left him bed for the next few days. (Tr. 432). Dr. Cannon reduced the dosage of Citalopram and added a trial of Buproprion.[11] On June 20, 2007, it was noted that plaintiff had lost ten pounds by watching his diet. His physical activity consisted of yard work and some swimming. (Tr. 420-21). At a medication review with Dr. Cannon on August 22, 2007, plaintiff's wife reported that plaintiff was less emotionally labile but continued to be irritable and had difficulty remembering simple tasks. (Tr. 418-19).

Plaintiff attended and actively participated in an 8-week exercise and weight control program in the late summer and fall of 2007. (Tr. 408-17). On October 30, 2007, he declined the offer of smoking cessation medication. (Tr. 401). On November 14, 2007, he reported to Dr. Cannon that he was "grouchy and irritable." (Tr. 397). Dr. Cannon increased the dosage of plaintiff's prescription for Buproprion.

---

[11]Buproprion is an antidepressant of the aminoketone class and is indicated for treatment of major depressive disorder. See Phys. Desk Ref. 1648-49 (63rd ed. 2009).

On January 3, 2008, plaintiff called the Medical Center with complaints that he had torn his rotator cuff again.[12] (Tr. 393). On January 4, 2008, he had a medication review with psychiatrist Antonina Gesmundo, M.D. (Tr. 389-93). Plaintiff reported that he was not getting any better. He described mood swings and anger outbursts with poor concentration and over-spending. Dr. Gesmundo prescribed Aripiprazole[13] for treatment of possible bipolar disorder.

An MRI of the right shoulder revealed tears in the rotator cuff. (Tr. 387). Plaintiff began physical therapy on January 27, 2008. (Tr. 382-83). On March 11, 2008, it was noted that plaintiff's blood sugar was elevated and he was started on Glipizide.[14] (Tr. 370). On March 29, 2008, plaintiff began occupational therapy to reduce pain associated with the torn rotator cuff. (Tr. 366).

On April 11, 2008, plaintiff and his wife reported to Dr. Gesmundo that he had fewer mood swings; his angry outbursts had reduced from daily to once or twice per week. He spent his days on the computer and doing household chores. He appeared calm, and neat and clean, and reported that he thought his medications were "just right." (Tr. 359). His medications were Bupropion,

---

[12]Plaintiff reported that he had felt the shoulder snap in November when lifting a heavy dutch oven. (Tr. 368).

[13]Aripiprazole is used to treat symptoms of schizophrenia, episodes of mania in persons with bipolar disorder, and depression when antidepressants alone are ineffective. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html (last visited on May 19, 2010).

[14]Glipizide is prescribed for the treatment of type 2 diabetes. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684060.html (last visited on Aug. 29, 2007).

Citalopram, Enalapril,[15] Glipizide, Hydrochlorothiazide,[16] Ibuprofen, Metformin, Nortriptyline, and Omeprazole. His GAF was 65. (Tr. 360). At an office visit on July 21, 2008, plaintiff described himself as "doing better," with angry outbursts limited to once or twice each week. He avoided other people, with the exception of his wife. He complained of poor concentration. Dr. Gesmundo noted that plaintiff seemed alert, calm, and cooperative, with fair grooming and hygiene. Plaintiff's GAF was 50. (Tr. 348-52).

Dr. Gesmundo completed a Mental Residual Functional Capacity Questionnaire on August 18, 2008. (Tr. 306-10). She listed plaintiff's diagnosis as Bipolar Disorder – Mixed and assigned a GAF score of 50. She noted that, since starting Aripiprazole, plaintiff reported that he experienced fewer mood swings and angry outbursts, although the medications can cause sedation. Among the clinical findings she listed were anger outbursts, irritability, depressed mood, low energy level, and poor concentration. She described his prognosis as guarded and stated that he could not "do/maintain competitive job." (Tr. 306). Dr. Gesmundo indicated that plaintiff displayed the following signs and symptoms: anhedonia, decreased energy, impairment in impulse control, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, bipolar

---

[15]Enalapril is used to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a686022.html (last visited on May 25, 2010).

[16]Hydrochlorothiazide is a diuretic used to treat high blood pressure. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (last visited on May 25, 2010).

syndrome with a history of episodic period of both manic and depressive syndromes and emotional lability. (Tr. 307).

The form required Dr. Gesmundo to assess plaintiff's "mental abilities and aptitudes needed to do unskilled work" on the following five point scale: "unlimited or very good," "limited but satisfactory," "seriously limited, but not precluded,"[17] "unable to meet competitive standards,"[18] and "no useful ability to function."[19] (Tr. 308). Dr. Gesmundo opined that plaintiff has "limited but satisfactory" ability to carry out short and simple instruction, sustain an ordinary routine without supervision, make simple work-related decisions, and ask simple questions or request assistance. She described as "seriously limited but not precluded," plaintiff's ability to remember procedures, understand and remember short and simple instructions, maintain attention for two hours, maintain regular attendance and punctuality, work in coordination with or proximity to others without undue distraction, complete a normal workday and workweek without interruption from psychologically based symptoms, perform at a consistent pace without unreasonable breaks, accept instruction and respond appropriately to criticism from

---

[17]The form defined "seriously limited, but not precluded" as "ability to function in this area is seriously limited and less than satisfactory but not precluded. This is a substantial loss of ability to perform the work-related activity." (Tr. 308)

[18]This term is defined as inability to "satisfactorily perform this activity independently, appropriately, effectively, and on a sustained basis in a regular work setting." (Tr. 308).

[19]This is "an extreme limitation [and] means your patient cannot perform this activity in a regular work setting." (Tr. 308).

supervisors, get along with coworkers, respond appropriately to changes in work setting, deal with work stress, and be aware of hazards and take precautions. (Tr. 308). Dr. Gesmundo also assessed as "seriously limited but not precluded" plaintiff's ability to interact appropriately with the public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and use public transportation. Plaintiff was assessed as "unable to meet competitive standards" with respect to his ability to travel in an unfamiliar place. (Tr. 309). Plaintiff did not have a low IQ. Pain from plaintiff's physical conditions increased his lability and irritability; his relevant physical conditions include diabetes, hypertension, and pain in his shoulder. Plaintiff's impairments or treatment would cause him to miss more than four days of work each month. He was not a malingerer. (Tr. 310).

Joan Singer, Ph.D., completed a Psychiatric Review Technique form on December 27, 2006. (Tr. 281-94). Dr. Singer indicated that plaintiff has an affective disorder – depression, and found that he had moderate limitations in performing the activities of daily living and maintaining social functioning, and maintaining concentration, persistence or pace. She noted that he did not have repeated episodes of decompensation of extended duration. (Tr. 289). In the Mental Residual Functional Capacity Assessment, Dr. Singer assessed plaintiff as having no more than moderate limitations in a number of work-related abilities. (Tr. 292-93). In the narrative portion, Dr. Singer noted that plaintiff's statements

regarding symptoms and limitations were inconsistent with the total evidence and

considered partially credible.  (Tr. 294).

## IV.  The ALJ's Decision

In the decision issued on November 26, 2008, the ALJ made the following findings:

1.  Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision.

2.  Plaintiff has the following severe impairments: diabetes mellitus, a right rotator cuff tear, asthma, depression, and obstructive sleep apnea.

3.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  Plaintiff has the Residual Functional Capacity to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, sit 6 hours in an 8-hour day; stand/walk 6 hours in an 8-hour day; occasionally push and pull with his dominant right upper extremity; and occasionally reach in all directions, including overhead, with his dominant right arm.  He must work in a temperature controlled environment and is limited to simple tasks that require no more than occasional contact with the general public and coworkers.

5.  Plaintiff cannot return to his past relevant work.

6.  Plaintiff is a younger individual.

7.  Plaintiff has at least a high school education and is able to communicate in English.

8.  Transferability of job skills is not an issue due to plaintiff's age.

9.  Considering his age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that plaintiff can perform.

10. Plaintiff has not been disabled within the meaning of the Social Security Act from December 22, 2005 through the date of the decision.

(Tr. 10-17).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly

limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

## A.    Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.    The ALJ's credibility findings;

2.    the plaintiff's vocational factors;

3.    the medical evidence;

4.    the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.    third-party corroboration of the plaintiff's impairments; and

6.    when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall, 274 F.3d at 1217, (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

**B.    Analysis**

Plaintiff contends that the ALJ's Residual Functional Capacity determination was based upon a mischaracterization of the findings of Dr. Joan Singer.  He also

alleges that the ALJ did not properly consider the opinion evidence and failed to develop the record.

### 1. The ALJ's Treatment of Dr. Singer's Findings

Dr. Singer assessed plaintiff's activities of daily living as <u>moderately</u> limited. (Tr. 289). However, in citing Dr. Singer's findings, the ALJ reported that Dr. Singer found that plaintiff had only <u>mild</u> restrictions of the activities of daily living. Plaintiff alleges that the ALJ intended to "adopt" Dr. Singer's findings in determining his RFC. The ALJ determined that plaintiff has the RFC to perform simple tasks that require no more than occasional contact with the general public and coworkers.[20] (Tr. 11). The VE opined that a hypothetical individual with this RFC could perform simple unskilled work. Plaintiff's claim appears to be that, but for the error in reciting Dr. Singer's findings, the ALJ would have made a different determination of his RFC -- one for which the VE would have testified that there were no jobs available.

This claim is puzzling for a number of reasons. First, even if the ALJ adopted Dr. Singer's assessment that plaintiff had moderate impairment of the activities of daily living, her report, in its entirety, does not support a conclusion that plaintiff is disabled. Furthermore, she found that plaintiff's complaints of disabling symptoms were not fully credible. Second, the ALJ clearly stated that he was <u>not</u> giving Dr. Singer's opinion controlling weight, so it can hardly be the case that he

---

[20]Plaintiff does not challenge the ALJ's credibility determination or findings with respect to his physical limitations.

"adopted" her findings.  Furthermore, the record supports a determination that plaintiff had only mild impairment of the activities of daily living:  He is able to surf the Internet, watch television, do laundry, clean the house, mow the lawn, drive a car, feed and walk pets, shop in stores and by computer, and care for his personal needs.  The ALJ noted that although claimant "described some activities which are fairly limited," these allegations were not wholly credible.  The ALJ further found that, even if plaintiff's allegations were credible, the medical evidence did not support a finding that the limitations were due to plaintiff's medical condition.  (Tr. 15).

Finally, there is no error with respect to the ALJ's RFC determination.  The RFC is the most that a claimant can do despite physical or mental limitations.  Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); 20 C.F.R. § 404.1545. The determination of RFC is a medical issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), which requires the consideration of supporting evidence from a medical professional, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Plaintiff asserts that the ALJ's RFC determination is not based on medical evidence because the ALJ discounted the opinions of Dr. Singer and Dr. Gesmundo.  The ALJ considered the opinion of Dr. Singer, conducted an independent review of the medical record, and assessed plaintiff's testimony concerning his daily activities. See Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (affirming ALJ's RFC determination).  The ALJ relied on medical evidence in reaching his RFC determination.

## 2.    The ALJ's Consideration of Opinion Evidence

Plaintiff contends that the ALJ erred by failing to give controlling weight to the opinion of his treating physician, Dr. Gesmundo.  "Controlling weight" is given to a treating source's opinion if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005) (quoting 20 C.F.R. § 416.927(d)(2)).  "The record must be evaluated as a whole to determine whether the treating physician's opinion should control."  Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009).  When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."  Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010) (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir.2002)).

The ALJ determined that Dr. Gesmundo's opinion that plaintiff was unable to maintain employment was inconsistent with the record as a whole.  Among the evidence noted was the following: Plaintiff did not have a history of psychiatric hospitalizations, his treatment consisted solely of medication checks every three months, and he did not participate in any kind of counseling. This limited treatment, the ALJ found, is inconsistent with severe and disabling symptoms.  (Tr. 15).  The ALJ also examined the medications that plaintiff takes and concluded that they did not support a finding of disabling limitations.  With respect to plaintiff's allegation that he suffered side effects from the medications, the ALJ noted that

a number of treatment notes specifically stated that plaintiff did not suffer from side effects. (Tr. 16). In addition, plaintiff testified that he believed the medications improved his symptoms. Impairments that are controllable or amenable to treatment do not support a finding of total disability. Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999). Furthermore, despite her statement that plaintiff cannot "do/maintain competitive job," Dr. Gesmundo did not assess any of plaintiff's abilities -- with the exception of travel in unfamiliar places -- as falling within the categories of "unable to meet competitive standards" or "no useful ability to function." At worst, Dr. Gesmundo assessed plaintiff's work-related abilities as "seriously limited, but not precluded," which does not convey a complete inability to function. See Colvin v. Barnhart, 475 F.3d 727, 731 (6th Cir. 2007) ("It defies logic to assert that a finding of "not precluded" actually means that one *is* precluded."); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000) ("The word 'fair' is both a measure of ability and disability. It is in the balance between poor ability to function and greater ability to function.") Thus, Dr. Gesmundo's statement that plaintiff is unable to work is inconsistent with her ratings of his specific abilities and is not entitled to controlling weight.

### 3. The ALJ's Failure to Develop the Record

Plaintiff claims that once the ALJ rejected Dr. Gesmundo's opinion he was required to recontact her to develop a full and fair record.

"A disability claimant is entitled to a 'full and fair hearing' under the Social Security Act." Hepp v. Astrue, 511 F.3d 798, 804 (8th Cir. 2008). Plaintiff

received such a hearing. First, the ALJ's determination was based on all the evidence in the record, including the medical records, observations of treating physicians and others, and plaintiff's own description of his limitations. Halverson v. Astrue, 600 F.3d 922, 933 (8th Cir. 2010) (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002)). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." Id. (quoting Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994)). The medical records were sufficient to properly determine that plaintiff was not disabled.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [Doc. #6] is **denied**.

**IT IS FURTHER ORDERED** that all other pending motions are denied as moot.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 6th day of July, 2010.